**MEGO CORP.**

v.

**UNITED STATES.**

**C.D. 4614; Court No. 72-1-00172.**

United States Customs Court.

Oct. 23, 1975.

---

Tompkins & Davidson, New York City (Allerton deC. Tompkins, New York City, of counsel), for plaintiff.

Rex E. Lee, Asst. Atty. Gen. (Frank J. Desiderio, New York City, trial attorney), for defendant.

MALETZ, Judge:

This action involves the question as to the proper tariff classification of merchandise imported from Taiwan in 1971 which was described on the invoice as (1) a "Vinyl sponge[1] leather glove" (hereafter referred to as "the baseball glove or gloves") and (2) a "Vinyl leather boxing glove" (hereafter referred to as "the boxing glove or gloves"). The merchandise was classified by the government under item 737.90 of the tariff schedules as other toys, not specially provided for, and assessed with duty at the modified rate of 21 percent ad valorem.[2]

Plaintiff contends that "the baseball gloves" are properly classifiable under item 734.54 as baseball gloves dutiable at the modified rate of 15 percent. Alternatively, it claims that the gloves are classifiable under item 735.05 as "other gloves * * * specially designed for use in sports," dutiable at the modified rate of 9 percent or under item 735.20 as game, sport, athletic or playground equipment, dutiable at the modified rate of 12 percent.

With respect to the imported "boxing gloves" plaintiff claims alternatively that they are properly classifiable under item 735.05 as boxing gloves dutiable at the modified rate of 9 percent or under item 735.20.

The following are the relevant provisions of the tariff schedules:

Classified under:

Subpart E [Schedule 7, Part 5].—Models; Dolls, Toys, Tricks, Party Favors

Subpart E headnotes:

1. The articles described in the provisions of this subpart (except parts) shall be classified in such provisions, whether or not such articles are more specifically provided for elsewhere in the tariff schedules, * * *—

\* \* \* \* \* \*

2. For the purposes of the tariff schedules, a "toy" is any article chiefly used for the amusement of children or adults.

\* \* \* \* \* \*

Toys, and parts of toys, not specially provided for:

\* \* \* \* \* \*

737.90 Other ....................21% ad val.

Claimed under:

Subpart D [Schedule 7, Part 5].— Games and Sporting Goods

Subpart D headnotes:

1. This subpart covers equipment designed for indoor or outdoor games, sports, gymnastics, or athletics, but does not cover—

\* \* \* \* \*

(v) other wearing apparel, other than specially designed protective articles such as, but not limited to, gloves, * * *

\* \* \* \* \* \*

Baseball equipment, and parts thereof:
734.54 Baseball and softball gloves and mitts ..............15% ad val.[3]

\* \* \* \* \* \*

735.05 Boxing gloves, and other gloves, not provided for in the foregoing provisions of this subpart, specially designed for use in sports .................... 9% ad val.

\* \* \* \* \* \*

735.20 Puzzles; game, sport, gymnastic, athletic, or playground equipment; all the foregoing, and parts thereof, not specially provided for .................12% ad val.

---

1. On the invoice the word "sponge" was erroneously spelled "spenge."

2. The assessed and claimed rates are rates that were modified by T.D. 68–9.

3. Pursuant to T.C. 68–9, Pres.Proc. 3822, 32 F.R. 19002, effective January 1, 1968, item 734.55 of the tariff schedules covering "Baseball equipment, and parts thereof" was deleted as a specific item but its language was retained as the superior heading preceding a new item 734.54 covering "Baseball and softball gloves and mitts."

## The Baseball Gloves

■ Incorporated in the present case was the record in *New York Merchandise Co., Inc. v. United States,* 62 Cust.Ct. 38, C.D. 3671, 294 F.Supp. 971 (1969), *appeal dismissed* 56 C.C.P.A. 133 (1969). In that case, articles invoiced as vinyl junior baseball gloves which were suitable for use by children below the age of eight in a baseball game were classified by the government as toys under the provisions of item 737.90. The court held, however, that, as claimed by plaintiff, the gloves were properly classifiable as baseball equipment under item 734.55 (the predecessor provision to item 734.54). As the basis for its holding, the court concluded that the importations were "junior edition" baseball gloves and that such gloves, while smaller, cheaper and less elaborate than larger, more expensive models were not regarded as toys, but rather were classifiable under the same provisions as the more expensive articles, i. e., item 734.55, since the cheaper items performed the same function on a smaller scale.

Against this background, the parties agree that the single issue on this phase of the case is whether or not the baseball gloves here in question are similar in all material respects to the baseball gloves involved in the incorporated *New York Merchandise* case.

Considering first the incorporated case, we note that the gloves therein are made of vinyl and are similar in appearance to the baseball gloves used by professionals. In the present case, the baseball gloves are likewise made of vinyl and are also similar in appearance to the baseball gloves used by professionals. It is to be added, however, that the gloves herein are slightly smaller but better constructed than the gloves in the incorporated case.[4]

Beyond that, examination of the sample glove in the present case and the sample glove in the incorporated case, coupled with the evidence in the record, discloses the following additional comparative characteristics of the two gloves:

| The baseball glove in the present case | The baseball glove in the incorporated case |
| --- | --- |
| Double stitching on the webbing between the thumb and first finger. | Single stitching on the webbing between the thumb and first finger. |
| Double strand woven nylon lacing between the fingers and at the base of the inside pocket which appears equal to or stronger than the rawhide lacing of the glove in the incorporated case. | Single strand rawhide lacing between the fingers and at the base of the inside pocket. |
| Back hand cross strap permanently attached by nylon lacing. | Back hand cross strap permanently attached by metal button. |
| Good pocket formation. | Poor pocket formation. |
| Formed polyurethane padding permanently affixed.[5] | Textile padding which can be moved around. |
| Light polyurethane padding in the thumb and little finger. | Heavier cotton padding in thumb and little finger. |
| Retail price between $1.00 and $1.49. | Retail price 98 cents. |

Further, examination of the samples demonstrates that the overall workmanship of the glove herein is of better quality than the glove in the incorporated case. For example, the binding of the glove here involved is made of nylon material which is neatly stitched around the bottom seams, whereas the binding of the glove in the incorporated case— which is made of vinyl—is stitched in an obviously poorer manner; the webbing on the glove in the present case is of superior design, quality and workmanship as contrasted with the webbing on the glove in the incorporated case; while the glove in the incorporated case has an extra welted seam on the thumb and little finger, in general the welted seams of the glove herein appear to be neater

4. This latter conclusion is based on an examination of the sample and the preponderance of the evidence.

5. Of interest· is the fact that neither defendant's exhibit A in the incorporated case nor defendant's exhibit C in the present case— which are illustrative of a vinyl and a leather baseball glove used in Little League competition—has any padding in the pocket.

and of better quality; the olive colored vinyl used for the outer facing of the glove in the present case is of considerably heavier gauge than the black colored vinyl used for the glove in the incorporated case. Finally, the court has compared the performance of the two gloves by catching a baseball a number of times with each of them and has concluded that while both are perfectly adequate for catching the ball, the glove in the present case is, particularly for children, more comfortable and easier to use than the one in the incorporated case.

From what has been said, it is apparent that the glove here in question is similar in all material respects, if not better, than the glove in the incorporated case. For that reason, it is held that the gloves presently under consideration come within the purview of item 734.54 as "Baseball * * * gloves * * *." And since the gloves are thus specially provided for under item 734.54, they are classifiable under that item rather than under item 735.05 or item 735.20, as alternatively claimed by plaintiff. See e. g. *New York Merchandise Co. v. United States, supra,* 62 Cust.Ct. at 44, 294 F.Supp. 971.

### The Boxing Gloves

Boxing gloves were not involved in the incorporated *New York Merchandise* case, hence the court's determination on this aspect must be based on consideration of the present record, including a sample of the boxing glove in issue. Examination of that sample shows that the glove is fully padded throughout with cotton felt which is covered with a cotton lining; has a formed thumb which is protected and padded, and a hard rubber bar sewn into the palm of the hand inside the glove to protect the fingers; contains an outer face made of soft black vinyl which is double stitched all around (save for single stitching at the bottom edge); comes equipped with soft cotton lacing; weighs about 4½ to 5 ounces; and appears to be well constructed.

Plaintiff's two witnesses [6] testified that the gloves were designed for children in the three to seven year age group; that they were sold in sets of two at a retail price of $1.00 to $1.49; and that as in the case of any boxing glove, the imported gloves protect a child's hands and also protect his opponent to some degree. Further, Mr. Kublan, the first of plaintiff's witnesses, testified that he had seen the glove used innumerable times in streets, playgrounds, backyards and schoolyards along the East Coast by boys from about four through seven years old as "boxing gloves, as sporting equipment to box, to punch a bag or * * * punch another kid" in a boxing match. (R. 31) The witness added that the imported glove here in issue, while different in construction and size from a regulation boxing glove, did not differ in use from a regulation boxing glove.

Further, the witness testified that the gloves were held out to the trade as junior boxing gloves. In this connection, in plaintiff's "Toy Catalogue" for 1971–1972, gloves substantially the same as those here were described as "JR. BOXING GLOVES—Authentic leather like soft boxing gloves. Safe and durable." The gloves were sold to major department stores and were generally displayed by them in a sporting goods section of the toy department. They were also sold to neighborhood stores which handled toys and sporting goods, among other things.

Plaintiff's second witness, Mr. Abrams, testified that he had seen the imported gloves used throughout the United States by boys in the age group three through seven "[b]oxing, hitting a bag, hitting one another, with a father present, shadow boxing." (R. 69) He further testified that the imported boxing gloves are used by children in the

---

**6.** Plaintiff's witnesses were Neal Kublan, director of creative projects of plaintiff, and Martin Abrams, president of plaintiff.

same way that boxing gloves are used by adults.

On the boxing glove issue, defendant likewise called two witnesses.[7] Its first witness, Mr. Mercante, was concededly well qualified in all phases of boxing (amateur, collegiate and professional) involving individuals who are 10 years old and older. He testified that in the Hempstead program, which is primarily instructional and (as noted before) involves youths ranging in age from 10 to 25, 16-ounce amateur regulation boxing gloves are used.[8] Such gloves, he stated, are sold in sets of four, with the price depending on the weight of the glove.

The witness added that the imported glove differed from the boxing glove used in the Hempstead program in the following respects: First the imported glove—which, as previously indicated, weighs between 4½ to 5 ounces—is much lighter than the 16-ounce glove used in the Hempstead program. Second, the imported glove is made of vinyl and the top part has ridges or waves, whereas the Hempstead program glove is made of kangaroo leather and is smooth all around. Third, the imported glove has a padding of cotton felt, while the padding of the regulation glove consists of foam rubber and horse or goat hair. Fourth, the imported glove is too small for boys age 10, 12 or 14 to get their hands into. Most of these characteristics of the imported glove, the witness testified, constitute "dangerous factors" which would preclude his purchasing such a glove for the Hempstead program. (R. 93)

Organized boxing for boys, Mr. Mercante continued, is a form of the sport in which there are specified written rules and competent personnel instructing, guiding and supervising the boys. The youngest child he has seen participating in such organized boxing was 10 years of age. Children of six or seven, he said, are too young to box at that age since they are unable to assimilate all the techniques of boxing; instead they are taught various rope skipping techniques and how to hold their hands. Despite his testimony that children in this age group are too young to box, the witness later testified that he had experience teaching boys from four to seven to box with gloves and in the course of such instruction provided them with regulation gloves rather than with gloves similar to the ones here in issue. In this context, he stated that he did not consider the imported gloves to be sporting equipment or suitable for use in the serious pursuit of boxing.

On cross-examination, he conceded that he had seen children "boxing" with gloves like those here in issue—but not extensively. (R. 104–5) He further testified that in the years 1950–1952 he was associated with the Wilson Sporting Goods Co. and sold gloves designed for use by children in the two to seven age group which were similar to those here in issue.[9] In connection with the children's gloves he sold in that period, he first testified that he had never seen them used by children aged seven or less (R. 105), but then contradicted himself to

---

7. Defendant's first witness was Arthur Mercante, who is presently a sales manager at the F. & M. Schaefer Brewing Co. and is also a consultant to a youth boxing program conducted by the Town of Hempstead, L. I., which program involves youths ranging in age from 10 to 25. In addition Mr. Mercante is a member of the New York State Athletic Commission as a referee, has for 21 years refereed professional boxing matches, including five major world heavyweight title fights, and has refereed amateur boxing for a period of 32 years. He has also coached collegiate boxing and has a master's degree in education in connection with which he wrote a thesis on boxing.

Defendant's second witness was John Defoe, a clerk with the Pennsylvania Railroad who is also supervisor of the boxing program of the Police Athletic League (P.A.L.) of New York City with which program he has been associated for some 30 years. The program consists of three divisions, with the participants being boys from 12 years of age to 20.

8. The witness Mercante testified that in the junior olympics and Golden Gloves, a 10-ounce glove is used while professional boxers use a 6- to 8-ounce glove.

9. The witness stated that he sold such gloves to sporting goods stores which had toy departments.

say that he had in fact seen children in that age category use such gloves but not extensively in any form of competition. (R. 106) He then stated that children between the ages of four and six are not too well coordinated and that they would put such gloves on and "skylark" with them, i. e., tap and "kind of slap at one another." (R. 106–7)

Mr. Defoe, defendant's other witness, as indicated before (n. 7), supervises the New York City P.A.L. boxing program which has a minimum age of 12 for participating children. He testified that the bigger and heavier the glove the less damage it would do and that for that reason the 12 year old boys participating in the P.A.L. program use the heaviest glove utilized in the program, i. e., a 14-ounce glove, as contrasted with the glove here in issue which weighs some 4½ ounces.[10] He agreed, however, that youngsters of 12 hit harder and need more protection than youngsters who are between the ages of four and seven. Continuing, he stated that the gloves used by the P.A.L. have more padding than the imported gloves, are made of leather rather than vinyl, and were always offered for sale to the P.A.L. in sets of four. He further testified that a glove similar to the one in issue had never been purchased by the P.A.L.; that in his opinion children aged four through seven could not seriously pursue the sport of boxing;[11] and that gloves such as the imported glove cannot be used in the serious pursuit of boxing by such children because they could get hurt using them inasmuch as such gloves have ridges on the front and side which would cause marks on youngsters hit with them.

On cross-examination, the witness stated that he had never trained children between the ages of four and seven and had never bought or sold a glove like the imported one. He also testified on cross-examination that he had seen a glove like the imported glove used about four times, but later changed his testimony to say that he had *never* seen a glove like the imported one being used. Finally, the witness testified that he had seen "youngsters *at eight years old box* but never with this [the imported] type of glove" but rather with a 10-ounce glove. (R. 124–5) [Emphasis added.] Previously, however, the witness had testified that "[y]oungsters three, four, five, six, seven, *even up to ten* still don't know enough" to engage in boxing. (R. 121) [Emphasis added.]

Turning now to the legal aspects, we start with the proposition that the mere fact that the imported gloves are smaller, cheaper and less elaborate than larger and more expensive gloves does not require that they be regarded as toys.[12] To the contrary, it is a settled principle in cases involving merchandise classified as toys, that a "junior edition" of a larger, more expensive article is classifiable under the same provision as the more expensive article, if the cheaper article performs the same function on a smaller scale. Thus in *United States v. Field & Co.*, 12 Ct.Cust.App. 543, T.D. 40738 (1925), the court considered the classification of small ninepin and tenpin sets which were used exclusively by children in the playing of a game. The sets were classified as toys under paragraph 1414 of the Tariff Act of 1922 and were claimed properly dutiable under paragraph 1402 of that act as game equipment. The court held that the sets were not toys, stating (p. 545):

It is apparent from the description of the dimensions of the pins and balls that the articles are not mere playthings. They are of sufficient size to

---

10. According to the witness, the smallest glove used in P.A.L. competition weighs 10 ounces.

11. With further reference to the foregoing, the witness stated that on several occasions he had seen six and seven year olds engage in competition using 10-ounce gloves but did not consider such competition to be boxing.

12. This portion of the present opinion dealing with the applicable legal principles has been borrowed virtually *in toto* from the opinion of this court in *New York Merchandise Co. v. United States, supra,* 62 Cust.Ct. 42–44, 294 F.Supp. 971.

require that they be used in the playing of the game for which they were designed in order to afford amusement to children. These articles may be said, figuratively speaking, to be "junior editions" of like articles used by adults in the playing of the game of "tenpins" or "ninepins," rather than miniatures of such articles, so small as to be unfitted for use as ninepins or tenpins, and intended to be used and actually used only as mere playthings for the amusement of children.

To similar import is *May Co. v. United States,* 67 Treas.Dec. 965, T.D. 47760 (1935), where this court had before it certain rackets, somewhat smaller and much lower in cost than the average racket used by adults in playing the game of tennis, but suitable for and used by children ranging in age from 8 to 14 years in playing the game of tennis. The court held that the rackets were not toys under paragraph 1513 of the Tariff Act of 1930, as classified, but rather were "junior editions," small rackets designed for small persons and therefore properly classifiable under paragraph 1502 of the act—an *eo nomine* provision for rackets used with balls. The following statement by the court bears repetition (p. 968):

> We have examined Exhibits 1 to 8. While they are not high-class expensive rackets such as are used by adults, who can afford such rackets, in playing the game of tennis, they are fairly well made, and of a reasonably substantial nature. We think they are eminently suitable for use by children in playing tennis, or hitting a ball "back and forth", as testified by Mr. Veir. * * * It is our judgment that the merchandise represented by all of these exhibits, including Exhibit 8, are "junior editions", that is, small rackets designed for small persons (*Wolf v. United States,* 19 C.C.P.A. 132). * * *

The decision in *May* was reaffirmed by this court in *F. W. Woolworth Co. v. United States,* 70 Treas.Dec. 435, T.D. 48573 (1936). "It is true [the court stated] that these rackets are cheap and cannot compare in strength, beauty of workmanship, or in length of life, with expensive tennis rackets used by professional players or adepts at the game of tennis; but there is nothing in paragraph 1502 to indicate that cheap, light rackets are excluded therefrom." *Id.* at 452.

Other cases in which inexpensive, "junior editions" of articles were held not classifiable as toys include *United States v. Strauss & Co.,* 13 Ct.Cust.App. 167, T.D. 41025 (1925) (croquet sets designed for use on a table); *United States v. Bernard, Judae & Co.,* 13 Ct.Cust.App. 306, T.D. 41230 (1925) (inexpensive musical instruments).

This "junior edition" concept has been carried over to the Tariff Schedules of the United States. Thus, Schedule 7 of the Explanatory Notes of the Tariff Commission's *Tariff Classification Study,* November 15, 1960, states (pp. 287–88):

> The classification problems connected with sports equipment and games and game equipment which may be chiefly used for the amusement of children are particularly troublesome. The product distinctions are elusive and it is not possible to completely resolve these problems in the revised schedule if, at the same time, an arrangement which would have some economic significance is to be achieved. It is felt, however, that the proposed arrangement of this subpart would help materially to overcome some of the present difficulties. *The earlier provisions of this subpart discussed above for equipment for various games, such as baseball, croquet, and golf, are derived principally from tariff paragraph 1502, and it is intended that the equipment which would be classified thereunder would be of such character and quality as is ordinarily used in the serious pursuit of the game or sport named. Such equipment may be diminutive in size for use by children, such as a boy's baseball glove, but it would nevertheless be classified under these provisions so long as it*

*was of a character suitable for use in organized play of these games.* All other articles which are not specially provided for elsewhere in the schedules and which are used in playing games or sports would be covered by this "basket" provision either as game, sport, gymnastic, athletic, or playground equipment not specially provided for. *Imitations of sports equipment are frequently made for small children. Such equipment is generally of very flimsy construction and is obviously not intended for, or used as, game or other equipment of the type provided for. Articles of this type are not covered by this subpart but would continue to be dutiable as toys and hence covered by the provisions for toys in subpart E of this part.*[13] [Emphasis added.]

■ Viewed against this background, it is concluded that the gloves in issue come within the "junior edition" concept. In the first place, while the gloves are different in construction and size from regulation gloves, examination of the sample shows that they are of a substantial nature and well made and not flimsy in construction. Thus, from its appearance, the imported glove would seem to be a junior edition of a boxing glove rather than an imitation of one.[14]

Second, the great preponderance of the credible testimony is that the imported gloves are widely used for boxing by boys in the four through seven year age group. Indeed, even defendant's witness Mercante conceded that he had seen children "boxing" with gloves like those here in issue—albeit not extensively. When it is considered that the imported gloves are widely used for boxing by children in the four through seven year old age group, it is obvious that the gloves are of a character suitable for use in the sport of boxing as it is pursued by youngsters in the foregoing age group. It is quite true that the imported gloves are not suitable for use in boxing programs such as the Hempstead and P.A.L. programs. But those programs are limited to boys whose minimum age is 10 and 12, respectively, and who thus are capable of hitting far harder and need more protection than boys between the ages of four and seven.

The court is quite mindful of the testimony on direct examination of defendant's two witnesses that children ages seven and younger are too young to box. In fact, according to defendant's second witness, even children up to the age of 10 still don't know enough to engage in boxing. But the weight to be accorded this testimony is considerably impaired (1) by the testimony on cross-examination of defendant's first witness that he had actually taught boys in the four to seven year age group how to box; and (2) by the testimony of defendant's second witness on cross-examination that he had seen youngsters aged eight box— this in contrast to his testimony on direct examination that even children up to the age of 10 are too young to engage in boxing.

In view of the foregoing, it is concluded that the gloves in issue are properly

---

**13.** The *Tariff Classification Study* has "the same standing as Summaries of Tariff Information which is recognized by the courts as authoritative for the purpose of resolving questions relating to the meaning and scope of terms appearing in tariff acts and in determining the intent of Congress." *Rifkin Textiles Corp. v. United States,* 54 C.C.P.A. 138, 141 C.A.D. 925 (1967).

**14.** In some cases the manner in which a company merchandises or displays goods may have some probative value in the classification of the goods. See e. g. *Davis Products, Inc. v. United States,* 59 Cust.Ct. 226, 230 C.D. 3127 (1967); *New York Merchandise Co. v. United States, supra,* 62 Cust.Ct. at 44, 294 F.Supp. 971. In the present case, however, merchandising practices are of no assistance in determining whether the gloves are toys or junior edition boxing gloves. For while the gloves are described in plaintiff's catalogue as "jr. boxing gloves," the catalogue itself is characterized on the cover as a "Toy Catalogue." Beyond that, while the gloves were ordinarily displayed by department stores in their sporting goods section, that section generally was located in the toy department.

classifiable under item 735.05 as "Boxing gloves." And since the gloves are thus specially provided for under item 735.05 they are classifiable under that item rather than under 735.20, as alternatively claimed by plaintiff.

### Conclusions

In summary, it is held (1) that the merchandise invoiced as a "Vinyl sponge leather glove" is properly classifiable under item 734.54 as baseball gloves, dutiable at the rate of 15 percent ad valorem; and (2) that the merchandise invoiced as a "Vinyl leather boxing glove" is properly classifiable under 735.05 as boxing gloves dutiable at the rate of 9 percent ad valorem. Plaintiff's claims are therefore sustained and judgment will be entered accordingly.